IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GEVA ENGINEERING GRP., CORP., <br><br> Plaintiff, <br><br> v. <br><br> FURMANITE AMERICA, INC., et al., <br><br> Defendants. | CIVIL NO.: 11-1671 (FAB/SCC) |

**REPORT AND RECOMMENDATION**

Plaintiff, a Puerto Rican corporation, filed suit in the Puerto Rico Court of First Instance, naming as defendants Furmanite America, Inc. ("Furmanite"), NAS Caribbean Corp. ("NAS"), and TSP Total Solution Corp. ("TSP"), all of which it alleged to be citizens of Puerto Rico, Docket No. 10-1, ¶¶ 2-4, and therefore not diverse from the plaintiff, making removal jurisdiction unavailable. 28 U.S.C. § 1441; see also Lincoln Prop. Co. v. Roche, 546 U.S. 81, 84 (2005). Defendant Furmanite nonetheless removed, arguing that it was not a citizen of Puerto Rico and that the other non-diverse defendants, NAS and TSP, had been fraudulently joined. Docket No. 8. We consider Plaintiff's pending motion to remand the case to Commonwealth court. Docket No. 7.[1]

**I.    Factual Background**

The following is drawn from Plaintiff's Commonwealth court complaint. Plaintiff, GEVA Engineering Group ("GEVA"), is a Puerto Rican corporation engaged in representation, distribution,

---

[1]The presiding district judge referred this case for all pretrial management, and we issue this report and recommendation pursuant to that authority. Docket No. 44.

1

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 2

sales, and maintenance services for a line of industrial and commercial leak-sealing products. Docket No. 10-1, ¶ 1. In 2006, GEVA entered into a relationship with Furmanite, becoming a sales representative and distributor of its products and services in Puerto Rico. Id. ¶ 6. Beginning on January 1, 2009, GEVA and Furmanite signed the first of three one-year contracts, by which GEVA alleges it became the exclusive sales representative for Furmanite in Puerto Rico. Id. ¶¶ 7-8, 16. In 2008, prior to these contracts' signing, GEVA secured as a Furmanite client the Puerto Rico Electric Power Authority ("PREPA"), whose business provided significant annual sales to Furmanite. Id. ¶ 14. At some point in late 2010, a billing conflict began to percolate between Furmanite and GEVA, and Furmanite started to unilaterally approach GEVA's competitors with an eye towards shifting some of GEVA's business their way. Id. ¶¶ 18-19. Around this same time, officers of NAS and TSP, with knowledge of GEVA's contract with Furmanite, began to visit GEVA clients, including PREPA, to offer the same Furmanite products and services that GEVA already provided. Id. ¶ 20. TSP and NAS have begun to sell directly to GEVA clients, resulting in a loss of sales and profit. Id. ¶ 24. Furmanite likewise has unilaterally ended its relationship with GEVA in violation of the contract's terms and, along with NAS and TSP, has notified GEVA clients, including PREPA, that NAS and TSP are now the designated representatives for Furmanite products in Puerto Rico. Id. ¶ 28.

## II. Furmanite's Citizenship

For the purposes of diversity jurisdiction, a corporation is a citizen of the state in which it is incorporated and the state in which its principal place of business is located. 28 U.S.C. § 1332(c)(1).

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 3

Furmanite is incorporated in Virginia, and so the relevant jurisdictional question here is whether its principal place of business is in Puerto Rico. In its original notice of removal, Furmanite alleged that it had its principal place of business in Puerto Rico, a fact which, if taken as true, would defeat diversity jurisdiction and require remand. Docket No. 1, at 1. However, Furmanite amended its notice of removal to correct what it called an "involuntary error," and it made clear that it wished to allege that its principal place of business was in fact in Texas. Docket No. 8, at 1 & n.1. Plaintiff would have us treat the original notice as a dispositive admission, uncorrectable by amendment, Docket No. 25, ¶ 2, but we believe that this is the incorrect course.

A notice of removal must be filed in the district court within thirty days of the defendant's receipt of a copy of the initial state court pleading on which the claim is based. 28 U.S.C. § 1446(b). As a general matter, courts have held that a removing party may freely amend its notice within the 30-day removal period, even to "correct imperfect statement[s] of citizenship." See 14C Charles Alan Wright, et al., Federal Practice & Procedure § 3733 (4th ed. 2011). Here, the state Commonwealth complaint was filed on June 21, 2011, Docket No. 1, ¶ 1, the original notice of removal was filed on July 12, 2011, id. at 18, and the amended notice was filed on July 28. Docket No. 8, at 17. The record does not make clear when Furmanite was served in the Commonwealth case, but it alleges that its amendment was made within the 30-day removal period. Docket No. 8, at 1 n.1. Plaintiff does not dispute this fact, and, given that only 37 days elapsed between the filing of the Commonwealth complaint and the amended notice, we find Furmanite's averment plausible. We therefore credit the amendment.

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 4

When contested, the burden of proof rests with "the party attempting to sustain diversity jurisdiction." Thomson v. Gaskill, 315 U.S. 442, 446 (1942). Therefore, Furmanite must prove that its "principal place of business . . . at the time the suit [was] instituted" was not Puerto Rico. Media Duplication Servs., Ltd. v. HDG Software, Inc., 928 F.2d 1228, 1236 (1st Cir. 1991). "Where there is inadequate evidence adduced to establish the location of a corporation's principal place of business at the time the complaint was filed, there are insufficient facts to support diversity jurisdiction." Id. In determining the location of a corporation's "primary place of business," the Supreme Court has held that the only proper test is the so-called "nerve center" test. Hertz Corp. v. Friend, 130 S. Ct. 1181, 1192 (2010). A corporate nerve center is its headquarters—the place "where a corporation's officers direct, control, and coordinate" the corporation's activities. Id.

Furmanite offers, as proof that its primary place of business is in Texas, an affidavit of its General Manager in charge of Furmanite's business in Puerto Rico. Docket No. 14-1, ¶¶ 1-2. According to the affidavit, Furmanite's Puerto Rican business is coordinated by Furmanite's South American division, headquartered in and operating out of Texas. Id. ¶¶ 6-7. Plaintiff provides no allegations or evidence in direct contradiction of the fact that Furmanite is headquartered in Texas. Instead, it suggests that Furmanite's principal place of business should be determined according to a rejected test[2] and offers evidence that Furmanite has been registered in Puerto Rico as a foreign

---

[2]Plaintiff relies largely on Diaz-Rodriguez v. Pep Boys Corp., 410 F.3d 56, 60-61 (1st Cir. 2005), which held that the nerve center test applied only to "far-flung" corporations and that the proper test for determining the principal place of business of a company with corporate offices in one jurisdiction but which did most of its business in another was the "locus of operations test." Plaintiff fails to note, however, that Diaz-Rodriguez's holding was expressly rejected

4

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 5

corporation since 1975—evidence which establishes exactly nothing with regard to the location of Furmanite's nerve center. Docket No. 25-1. We therefore find that Furmanite's principal place of business is in Texas and that it is therefore diverse from Plaintiff.

### III. Fraudulent Joinder

In addition to arguing that it is not a citizen of Puerto Rico, Furmanite contends that the two indisputably Puerto Rican defendants, NAS and TSP, were fraudulently joined in this action. Fraudulent joinder is the joining, by a plaintiff, of defendants, against whom the plaintiff does not seek to secure a judgment, for the sole purpose of defeating diversity. See Mills v. Allegiance Healthcare Corp., 178 F. Supp. 2d 1, 4 (D. Mass. 2001). The doctrine is meant to "ensure that removal procedure is fairy applied." Linnin v. Michielsens, 372 F. Supp. 2d 811, 817 (E.D. Va. 2005) (mem. op.). While the First Circuit has never articulated a precise standard for deciding fraudulent joinder cases, see Mills, 178 F. Supp. 2d at 4-5, it has noted that "a finding of fraudulent joinder bears an implicit finding that the plaintiff has failed to state a cause of action against the fraudulently joined defendant." Polyplastics, Inc. v. Transconex, Inc., 713 F.2d 875, 877 (1st Cir. 1983). In light of this direction, other courts in this district considering fraudulent joinder allegations have tended to follow the Fifth Circuit. See, e.g., Renaissance Mktg., Inc. v. Monitronics Int'l, Inc., 606 F. Supp. 2d 201 (D.P.R. 2009) (following Smith v. Petsmart, Inc., 278 Fed. App'x 377, 379 (5th Cir. 2008)); Figueroa v. BASF Corp., No. 05-1317(CCC), 2006 U.S. Dist. LEXIS 59911, *4-5

---

by Hertz Corp. v. Friend, 130 S. Ct. 1181, 1191 (2010) (applying the nerve center test to all corporations and rejecting the analysis in Diaz-Rodriguez).

(D.P.R. Aug. 18, 2006) (following Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003)).

In the Fifth Circuit, to prove fraudulent joinder a defendant must show that either (1) there was actual fraud in the pleading of jurisdictional facts, or (2) the plaintiff is unable to establish a cause of action against the non-diverse party in state court. Larroquette v. Cardinal Health 200, Inc., 466 F.3d 373, 376 (5th Cir. 2006). Here, Furmanite does not allege fraud in the pleading of jurisdictional facts, and we are concerned only with the second prong of the Fifth Circuit's test: whether Plaintiff's complaint failed to state a cause of action against the non-diverse parties. In this situation, the Fifth Circuit, "ordinarily conduct[s] a Rule 12(b)(6)-type analysis, looking initially at the allegations of the compliant to determine whether, under state law, the complaint states a claim against the in-state defendant." Id.[3] However, a court may, at its discretion, look at summary-judgment-type evidence, see Larroquette, 466 F.3d at 376, and must resolve all factual and legal ambiguities in favor of the plaintiff. See Figueroa, 2006 U.S. Dist. LEXIS 59911, at *5. Thus, while some courts in this district have suggested that a defendant alleging fraudulent joinder bears a particularly heavy burden,[4] it seems simplest to treat the inquiry as a modified 12(b)(6) analysis,

---

[3]But see Hartley v. CSX Transp. Corp., 187 F.3d 422, 424 (4th Cir. 1999) ("The party alleging fraudulent joinder bears a heavy burden. . . . Th[e] standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Rule 12(b)(6).").

[4]See, e.g., Renaissance Mktg., Inc. v. Monitronics Int'l, Inc., 606 F. Supp. 2d 201, 208 (D.P.R. 2009) ("[A] defendant seeking to prove that a co-defendant was fraudulently joined bears an extremely heavy burden."); see generally E. Farish Percy, Making a Federal Case of It: Removing Civil Cases to Federal Court Based on Fraudulent Joinder, 91 Iowa L. Rev. 189, 216-20 (2005) (explaining that the federal courts of appeals currently apply an array of tests in fraudulent joinder cases).

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 7

asking whether the state court complaint states a plausible claim to relief.

A plaintiff alleging tortious inteference with contract under Puerto Rican law, see P.R. Laws Ann. tit. 31, § 5141, must show: (1) that a contract existed, (2) that the defendant interfered with that contract, (3) fault on the part of the defendant, (4) damage to the plaintiff, and (5) a nexus between the defendant's fault and the plaintiff's damage. New Commc'n Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citing Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc., 115 P.R. Offic. Trans. 727, 734 (1984)). The fault element requires that the defendant's interference be intentional and with knowledge of the contract's existence—that is, the defendant must have "intended to interfere with the contract, knowing that this interference would cause injury to the plaintiff." Id. at 10 (citing Figueroa v. Walgreens of San Patricio, Inc., 155 P.R. Dec. 560 (2001)).

Plaintiff's complaint on its face pleads all of these elements. A contract existed between Plaintiff and Furmanite. Docket No. 10-1, ¶ 16. TSP and NAS, acting with knowledge of this contract, took actions intended to interfere with it, namely approaching Plaintiff's clients with the intention of poaching them and informing those clients that Plaintiff's relationship with Furmanite had ceased.[5] Id. ¶¶ 24, 26, 28. Because of this interference, Plaintiff suffered monetary damages in the form of lost profits. Id. ¶ 24. We believe that these pled facts make out a plausible claim to relief.

---

[5] The complaint directly alleges NAS's and TSP's knowledge of the contract but does not directly allege intent. It need not do so, however, because a jury could reasonably infer such intent from the companies' actions. See Huongsten Prod. Import & Export Co. Ltd. v. Sanco Metals LLC, No. 10-1610(SEC), 2011 WL 3607816, *7 (D.P.R. Aug. 16, 2011) ("The aggrieved party need only show or present evidence from which it could be inferred that the third person acted in a willful manner . . . ." (citing Gen Office Prods. Corp. v. A.M. Capen's Sons, Inc., 115 P.R. Offic. Trans. 727, 734 (1984))).

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 8

Furmanite, however, ignores Plaintiff's pleadings as to TSP and NAS and argues, essentially, that the nature of its contract with Plaintiff make Plaintiff's tortious interference claims legally impossible. Furmanite's bottom line is this: the contract between Plaintiff and Furmanite was non-exclusive, and Furmanite was therefore within its contractual rights to seek other competing sales representatives in Puerto Rico, including NAS and TSP. Because Furmanite was acting within its rights in entering into relationships with NAS and TSP, those companies' actions on behalf of Furmanite, even where they interfered with Plaintiff's relationship with its clients or Furmanite, cannot constitute tortious interference.[6] Docket No. 14, at 13. This argument is unavailing. Furmanite is correct that its contract with Plaintiff was non-exclusive. See Docket No. 19-3, ¶ 1 (granting Plaintiff "the nonexclusive right to solicit orders . . . in the territory" of Puerto Rico).[7] Because the contract was nonexclusive, Furmanite was indeed acting within its rights when it sought additional sales representatives, including NAS and TSP. But exclusivity of contractual relationships is not an

---

[6] Plaintiff brings claims against Furmanite under Puerto Rican statutes relating to distributorship and exclusive sales representative relationships. See P.R. Laws Ann. tit. 10, § 278 ("Law 75"); P.R. Laws. Ann. tit. 10, § 279-279h ("Law 21"). In arguing that the non-exclusive relationship between Furmanite and Plaintiff invalidates Plaintiff's claims against NAS and TSP, Furmanite strongly implies that a finding that Law 21 or 75 applies to the contract with Furmanite is a prerequisite to Plaintiff's tortious interference claims, and to that end it expends much effort in showing that neither of those laws are applicable here. Docket No. 14, at 11-21. But Furmanite provides no law whatsoever demonstrating an exclusive relationship between Laws 21 and 75 and actions for tortious interference, and we therefore do not consider its arguments about those Laws' applicability.

[7] Plaintiff's argument to the contrary relies on an admittedly curious letter, dated October 19, 2009, from Furmanite's International General Manager to PREPA referring to Plaintiff as Furmanite's "exclusive Sales & Service representative" in Puerto Rico, through which all products should be bought and services coordinated. Docket No. 25-3. But the contract's language with respect to exclusivity is plain and unambiguous, and we will not allow it to be contravened by extracontractual evidence, especially when that evidence predates the execution of the relevant contract. See Docket No. 10-1, ¶ 16 (noting that the effective date of the contract was January 21, 2010).

GEVA Eng'g Grp., Corp. v. Furmanite Am., Inc.
Civil No. 11-1671 (FAB/SCC)
Report and Recommendation
Page No. 9

element of a tortious interference claim, and the validity of the contract between the competitors and Furmanite, or those competitors' right to seek out clients, is not an absolute defense to such a claim. To the contrary, TSP and NAS could have entered into contracts with Furmanite with the intent of interfering with Plaintiff's rights under its separate contract with Furmanite. Considering the allegations that TSP and NAS approached Plaintiff's clients in an attempt to steal them away from Plaintiff—attempts that, according to the allegations, secured Furmanite' breach of its contractual duties with Plaintiff,[8] Docket No. 10-1, ¶¶ 22, 24, 28—we believe that sufficient factual material has been pled to state a claim for tortious interference with contract. TSP and NAS were therefore not fraudulently joined, and complete diversity does not exist.

---

[8] It is usually the case that a claim for tortious interference will not lie where the party alleged to have broken the contract after the interference had a right or privilege to do so. See 15 Arthur L. Corbin, et al., Corbin on Contracts § 85.16 ("If, by the terms of a contract, a party to the contract has the power and privilege of termination, by notice or otherwise, one who induces the party to the contract to exercise that power does not induce a breach of contract."). Furmanite makes such a claim. First, it argues that it had a right to terminate the contract. But it had such a right, prior to the contract expiring by its own terms, only on written notice to Plaintiff, Docket No. 19-3, ¶ 15, notice which Plaintiff says it never received. Docket No. 10-1, ¶ 28. Second, it argues that it had just cause for terminating the contract based on Plaintiff's failure to pay Furmanite for various services it has rendered. Docket No. 14, at 20-21. Even if this argument has merit, though, it's premature at this point. On a motion to remand, all factual and legal ambiguities are resolved in favor of the Plainitff, and given that standard, there simply are not sufficient facts in the record at this stage to determine whether Plaintiff has failed to pay any money it owes Furmanite or whether that failure would amount to a breach of contract.

For an example of a case where contractual language *did* preclude a tortious interference claim, see Caribe Indus. Sys., Inc. v. Nat'l Starch & Chem. Co., 36 F. Supp. 2d 448 (D.P.R. 1999), *aff'd on other grounds*, 212 F.3d 26 (1st Cir. 2000). There, Caribe had a non-exclusive distribution agreement with National to sell National's adhesives, under which it entered into a sales agreement with a third party, Checkpoint Systems. Caribe, 36 F. Supp. 2d at 449-450. Later, Checkpoint and National entered into a direct sales agreement, cutting out Caribe, which sued National for tortious interference. Id. at 450. The court dismissed the tortious interference claim, finding that the agreement between Checkpoint and Caribe allowed Checkpoint to stop purchasing from Caribe on 90 days notice, which requirement Checkpoint had complied with before entering into a contract with National. Id. at 451. Because Checkpoint legally terminated its agreement with Caribe, National could not be accused of procuring that contract's breach, and therefore could not be liable for tortious interference. Id.

### IV.   Conclusion

For the reasons stated above, we do not believe that diversity jurisdiction exists here. Accordingly, we recommend that the case be dismissed without prejudice and remanded to Commonwealth court.

IT IS SO RECOMMENDED.

The parties have ten business days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

San Juan, Puerto Rico, this 13th day of December, 2011.

s/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE